**Ross D. MARGRAVES, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–97–00271–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

June 10, 1999.

David H. Berg, Jeff Joyce, James E. Essig, Gene L. Locke, Houston, for appellant.

Matthew W. Paul, Austin, for appellee.

* Senior Justices Bill Cannon, Joe L. Draughn, and Ross A. Sears sitting by assignment.

1. Amici Curiae Robert Allen, James Baker, Billy Burge, Holcombe Crosswell, Bob Cruikshank, John Lindsey, Vidal Martinez, John Moores, Jack Rains, Joe Reynolds, Clive Runnells, and Michael Stevens (the "Concerned Individual Public Officials") filed a brief contending that Appellant's conviction will have a chilling effect on public service, will jeopardize the ability of the government to recruit

Panel consists of Justices CANNON, DRAUGHN, and SEARS.*

## OPINION

BILL CANNON, Justice (Assigned).

Appellant, Ross D. Margraves, Jr., appeals his conviction for official misconduct. A jury in Lee County, Texas returned a guilty verdict in September 1996 after appellant's motion for change of venue from Brazos County was granted in July 1996. On November 22, 1996, the trial court accepted an agreement reached by the parties and set punishment at four years probation, a $3,000 fine, and $1,435 in restitution. Appellant filed a motion for new trial on November 22, 1996, and, after hearing testimony and argument, the trial court denied the motion for new trial on February 6, 1997. We reverse and render a judgment of acquittal.

In eight points of error, appellant contends: (1) the evidence was insufficient to support the conviction; (2) the official misconduct statute is unconstitutionally vague; (3) a fatal variance existed between the indictment and the charge; (4) the evidence did not support the indictment or the charge; (5) the trial court erred in including certain special instructions as part of the court's charge; (6) the trial court erred in permitting the State to reserve its entire closing argument for rebuttal; (7) the trial court erred in denying appellant's motion for new trial based on newly discovered evidence that likely could have affected the judgment; and (8) civil liability is the exclusive remedy for misuse of a state aircraft.[1]

qualified citizens to accept appointments for public service, and will severely limit a public official's ability to fulfill his or her responsibilities and duties. The Concerned Individual Public Officials contend that section 39.02(a)(2) of the Texas Penal Code is not intended to punish public servants who conduct important public business using government-funded travel and also carry out a personal task with no extra cost to the public while involved in the travel.

## I.

### *Overview*

This case involves what, at first, appears to be a relatively simple issue. The State contends appellant used an aircraft owned by Texas A & M University ("Texas A & M") to travel from Hobby Airport in Houston, Texas to Baton Rouge, Louisiana for the exclusive purpose of attending his son's graduation at Louisiana State University ("LSU"). Appellant's wife accompanied him on this trip. According to the State, this is sufficient to justify appellant's conviction under section 39.02 of the Texas Penal Code for official misconduct. Appellant does not dispute that one of the reasons for traveling to LSU was to attend his son's graduation; but, he claims he also traveled to LSU to have a face-to-face meeting with the Chancellor of LSU concerning matters of mutual importance to the two universities. Accordingly, appellant characterizes this action as a "mixed use" case that cannot survive his constitutional and sufficiency challenges, among other reasons.

In 1993, appellant was elected Chairman of the Texas A & M Board of Regents, after serving as a member of the Board since his appointment in 1989. On August 4, 1993, appellant and his wife flew on a Texas A & M airplane to Baton Rouge, Louisiana, on the day of their son's graduation. While at LSU, appellant sat on the stage as a member of the graduation party representing Texas A & M, was awarded a medal by the Chancellor of LSU, and said a few words to the graduation audience upon receiving the medal. After the graduation concluded, appellant met with his son for about ten minutes and then met with the Chancellor in his office and for lunch at a local country club. Appellant and his wife then returned to the Baton Rouge airport and flew to Hobby Airport in Houston. After dropping them off, the Texas A & M aircraft returned to the airfield in College Station.

Some time later, appellant was indicted for official misconduct under section 39.02 of the Texas Penal Code, a third degree felony. *See* TEX. PEN.CODE ANN. § 39.02(a)(2) (Vernon 1994). The main questions to be decided on appeal are (1) whether a public servant who uses government property that results in both an official benefit and personal benefit has violated section 39.02(a)(2); and (2) whether section 39.02(a)(2) gives adequate notice to public servants that they may be prosecuted for the mixed use of state property, i.e., a use that benefits both the State and the public servant. We hold that a "mixed use" does not violate section 39.02(a)(2) and that the statute does not provide adequate notice that a public official can be prosecuted for the "mixed use" of state property.

## II.

### *Factual Background*

In early 1993, the Southwest Athletic Conference was in its death throes. While reluctant to reopen old wounds, one of the primary subplots in this action is what conference Texas A & M would join upon the eventual dissolution of the Southwest Conference. At trial, there was much testimony concerning back-room meetings regarding the Pacific 10, the Big 8, and the Southeast Conference. Some Athletic Conferences only wanted certain teams from the Southwest Conference to join and witnesses testified that the smaller schools in the Southwest Conference wanted to piggyback along with Texas A & M and the University of Texas in order to share in greater future revenues. The University of Arkansas had recently departed the Southwest Conference and joined the Southeast Conference. There is testimony that LSU, another member of the Southeast Conference, was attempting to persuade Texas A & M to come aboard also. There was testimony of both direct and indirect threats from Texas legislators and the executive branch if Texas A & M joined the Southeast Conference. Ulti-

mately, Texas A & M, the University of Texas, Baylor University, and Texas Tech University joined the Big 8 Conference, which became the Big 12. The University of Houston, Southern Methodist University and Rice University went elsewhere. It is against this backdrop that we review the evidence presented during trial.

## A. *Appellant's Analysis of the Evidence*

Appellant graduated from Texas A & M in 1963, received a law degree from the University of Texas in 1965, and is presently a shareholder with a large Houston law firm. After being appointed to serve as a member on the Texas A & M Board of Regents in 1989, appellant was elected chairman of the Board of Regents in 1991 and served in that capacity until 1994. While serving on the board, appellant was involved in other organizations such as the Bush Presidential Library Committee, the Finance and Audit Committee, the Strategic Objectives Committee, the Prairie View A & M University Development Foundation, the Core Enhancement Committee, and the University System's Executive Committee.

In March 1993, Dr. William E. Davis, the Chancellor of LSU, forwarded appellant a written invitation to participate as a member of the official party at LSU's commencement exercises in August 1993 when appellant's son was scheduled to graduate. Dr. Bill Mobley, former Chancellor and President of Texas A & M, was involved in securing appellant's invitation from Dr. Davis of LSU. Dr. Mobley testified, however, that appellant never requested to be invited to sit on the stage for the graduation ceremonies. Dr. Davis testified that, after learning that one of Texas A & M's Regents had a son graduating, he decided to invite appellant as a guest of LSU to "sit with the official party." He said he copied Dr. Mobley with his invitation to appellant because he felt it would be a breach of protocol not to inform the president of Texas A & M that Dr. Davis, as the LSU counterpart, was planning to

meet with appellant, who was above Dr. Mobley in Texas A & M's hierarchy. After Dr. Davis' written invitation, appellant testified the two spoke by telephone a "half-a-dozen" times, with the primary topic of conversation being the status of the Southwest Conference.

On August 4, 1993, appellant and his wife flew on a Texas A & M aircraft to Baton Rouge, Louisiana to attend the LSU commencement. While there, appellant sat on the stage as an "official member" of the commencement proceedings and met with Dr. Davis after graduation to discuss, among other things, the possibility of Texas A & M joining the Southeast Conference. According to Dr. Davis, he and appellant met to discuss several items of importance to Texas A & M: (1) whether Texas A & M would join the Southeast Conference; (2) the financial arrangements of the Southeast Conference; and (3) the possibility that Texas A & M would hire an LSU administrator as its Dean of Engineering. Dr. Davis acknowledged that LSU desired Texas A & M to join the Southeast Conference. He stated that appellant told him there was a "lot of pressure" from Texas political leadership not to break up the old Southwest Conference and recognized that LSU's discussions with Texas A & M needed to be discreet due to this political pressure. Dr. Davis claims he told appellant that he understood the political climate, but he thought things were moving rapidly and wanted Texas A & M to keep LSU in mind for future expansion. Dr. Davis also testified that he made sure appellant sat next to his LSU counterpart, the President of LSU's Board of Supervisors, during the commencement exercises and that the two had an opportunity to speak following the program. Dr. Davis testified he was grateful for the opportunity to meet with appellant, because he had the chance to "inform the person who was chairing [Texas A & M's] important decision-making body of some of the pros and cons" of joining the Southeast Conference. He felt that by meeting with

appellant he could help create a climate where LSU's recommendation regarding the Southeast Conference might be more likely to be accepted by the remainder of Texas A & M's Board.

Dr. Mobley, the State's first witness, acknowledged that appellant was vested with great discretion in determining what was official state business and, therefore, an appropriate use of a Texas A & M aircraft. Dr. Mobley also conceded that making this type of judgment call involved innumerable factors in each particular case and stated there is "a lot of flexibility" in Texas A & M's rules. He also told appellant before the trip to Baton Rouge that LSU's Chancellor would probably press the issue concerning the possibility of Texas A & M joining the Southeast Conference. Dr. Mobley also testified that appellant, as a Regent, would have the obligation to report the results of his conversation with Dr. Davis to Texas A & M's search committee concerning the qualifications of the LSU administrator that Texas A & M was recruiting. Dr. Mobley recalled discussing Texas A & M's athletic situation with appellant after the Baton Rouge trip and also thought he recalled discussing the LSU administrator Texas A & M was attempting to recruit. According to Dr. Mobley, appellant, as the chairman of the Athletic Committee on the Board, had certain oversight and policy-making responsibilities concerning the Athletic Department, including reporting to the Board. Dr. Mobley also acknowledged that it would be the "Board of Regents' call" to recommend Texas A & M's new athletic alliance.

In counterpoint to the State's contention that the presence of appellant's wife in Baton Rouge served no official purpose, Dr. Mobley testified that his wife accompanied him on numerous occasions and referred to her as one of Texas A & M's "best diplomats." Again, Dr. Mobley testified that Texas A & M's policy governing spousal travel was "flexible" and conceded the regulations were "pretty much in the

eyes of the beholder." When questioned whether someone could have an opposite, but reasonable view, on the propriety of the use of a Texas A & M aircraft, Dr. Mobley responded, "I assume that's why we're here."

The testimony also established that other Texas A & M Regents were aware of appellant's intentions when he took the trip. The Board of Regents later ratified appellant's trip expenses in accordance with their usual practice. No other Regent objected to appellant's use of the plane. Bill Clayton, a former Texas A & M Regent and a member of the Aircraft Pooling Board testified that appellant's use of the plane was proper because it was "crucial" to obtain the information on the Southeast Conference. John David Crow, the Director of Development for Texas A & M's Athletic Department, testified that appellant told him in the spring of 1993, before the Baton Rouge trip, that an informal poll of the Board favored moving forward with further investigations of the Southeast Conference. John Lindsey, another Regent, testified that appellant's discussion with Dr. Davis in August 1993, concerning the possibility of Texas A & M joining the Southeast Conference, constituted extremely important state business on behalf of Texas A & M. Lindsey also testified appellant was the "point person" on Texas A & M's Board looking into issues concerning the impending break-up of the Southwest Conference. Lindsey stated the Board did not discuss the possibility of joining the Southeast Conference during open Board meetings, but did discuss it after the sessions were over. After he returned to Houston, appellant received additional information from Jerry Baudin, LSU's Vice–Chancellor for Business Affairs, relating to LSU's intercollegiate athletic revenues and its expenditures for the fiscal year 1991–1992.

R.C. Slocum, Texas A & M's head football coach, testified that the information appellant obtained concerning the Southeast Conference was the type of informa-

tion he and Texas A & M needed to determine the school's future athletic affiliation. At appellant's request, Slocum contacted a commissioner with the Southeast Conference and asked him to check with the presidents of other Southeast Conference schools to see if there was any additional interest in Texas A & M. Slocum also agreed that discretion was necessary in making these inquiries due to the sensitivity surrounding the break-up of the Southwest Conference. Slocum stated Texas A & M did not want to be perceived as actively participating in the break-up, but the university needed to be prepared for that eventuality. To fail to act would have been "irresponsible," Slocum testified. Slocum also spoke with other Board members about Texas A & M's future athletic affiliation. Before appellant's trip to Baton Rouge, Slocum recalled a meeting between himself, appellant, John David Crow, and Dr. Mobley where they discussed the imminent break-up of the Southwest Conference. The four agreed they needed to be prepared and discussed possible courses of action. Slocum testified further that there was an element at Texas A & M that favored joining the Pacific 10 Conference.

Appellant contends the State rebutted absolutely none of the testimony that official business occurred on the trip to LSU. Instead, the State merely showed that similar information, such as the possibility of joining the Southeast Conference, the financial condition of the Southeast Conference and discussions concerning the retention of a possible dean, could have been achieved by cheaper means such as a telephone call or a letter. As such, appellant contends the State never proved a violation of section 39.02(a)(2) beyond a reasonable doubt.

### B.  *The State's Analysis of the Evidence*

The thrust of the State's argument is that appellant reserved the Texas A & M aircraft to travel to LSU to attend his son's graduation and then went about inventing or seeking a justifiable "official" purpose to be present in Baton Rouge, Louisiana on that date. The State also attempted to show that appellant's ostensible official purposes behind sitting down for a face-to-face meeting with Dr. Davis could have been achieved at a far lower cost to the taxpayers. According to the State, Dr. Mobley received a phone call from appellant in March of 1993 in which appellant told Dr. Mobley that his son was graduating from LSU and wanted to know if Dr. Mobley knew the LSU Chancellor. Dr. Mobley claims appellant wanted him to find out if there were any special activities for dignitaries at LSU like there were at Texas A & M graduations. Dr. Mobley interpreted the conversation to mean that appellant wanted an invitation to the commencement ceremony, so he told appellant he would check with LSU.

As a result, Dr. Mobley called Chancellor Davis at LSU and, according to Dr. Mobley, Dr. Davis agreed to invite appellant to the graduation ceremonies. Dr. Davis extended this invitation in a letter dated March 30, 1993, which provided:

Dear Mr. Margraves,

President Bill Mobley of Texas A & M University has informed me that your son, Paul Margraves, will be graduating from LSU this August with a Bachelor's degree in General Studies. We would be pleased and honored to have you join us as a member of the official party for this commencement exercise. It would be meaningful to you as you watch your son receive his degree and meaningful to us to have a distinguished member of the Texas A & M Board of Regents grace our platform. As we approach the date, August 4th, I would be happy to make reservations for you at our faculty club as well as assist with any other arrangements that you might wish to have us make. Again, we would be pleased to have you join us for this special occasion in your life and the life of LSU.

Dr. Davis does not recall any further communication with appellant before the graduation ceremonies.

Two weeks later on April 13, 1993, appellant told Vickie Running, the Executive Secretary to the Board of Regents of Texas A & M, to reserve the largest and newest aircraft for his August 4, 1993 trip to LSU. The State places great significance on the fact that the reservation was made four months in advance. According to the State, appellant told Ms. Running that the purpose of the trip was to make the commencement address, but he did not make any such address. The State played a videotape of the August 4, 1993, commencement ceremonies, which verified that appellant did not know he was to speak that day. When LSU officials presented him with a medal, he said, "Dr. Davis did not tell me I was going to have to get up here and do or say anything."

On July 29, 1993, Dr. Davis' secretary sent another letter to appellant regarding the upcoming trip that stated, in part:

The LSU Commencement Planning Committee is pleased that you will participate in our summer commencement. The exercise is to be held on Wednesday, August 4th. You will be a member of our platform party, which will assemble in the L Club Room at nine o'clock. The academic procession will begin at approximately 9:30. The family is invited to join you at the L club prior to the ceremony, and she will have them escorted to reserved seating area prior to the procession.

The secretary also said she would leave the parking pass at the Faculty Club near the Assembly Center on the morning of commencement, and suggested appellant call if he had any further questions.

Appellant, with the help of Ms. Running, prepared an agenda for the day of graduation. Appellant wanted to arrive in Baton Rouge at 8:00 a.m. and depart at 1:30 p.m. On August 4, 1993, a pilot and a co-pilot took off from College Station airport in one of the University's aircraft at approxi-

mately 6:15 a.m. They picked up appellant and his wife at Houston Hobby airport at 7:00 a.m. and then flew the ten-passenger aircraft to Baton Rouge, arriving at 8:20 a.m. The pilots waited until appellant and his wife returned to the Baton Rouge airport at approximately 2:15 p.m. and flew to Houston Hobby Airport to drop off appellant and his wife. The plane then returned to College Station at around 4:00 p.m. Uncontroverted testimony established that the cost for the airplane's flight time was $1,435.

Dr. Davis testified that as a result of his conversation with Dr. Mobley, he invited appellant to attend the graduation and that it was common courtesy among higher education institutions to invite dignitaries of other universities if their child was graduating. The State claims the basic purpose of the invitation was to have appellant on the stage to see his son graduate, and that Dr. Davis made no mention of any other purpose for the trip in his written invitation. Dr. Davis did not know appellant before August 4, 1993, and could not remember speaking to appellant before the day of the graduation. The graduation ceremonies lasted from 9:30 until 11:00 a.m. Immediately after the graduation, appellant met with his son and had a picture taken with his son and other LSU officials. After the brief meeting with his son, appellant, Dr. Davis, and their wives went to Dr. Davis' office before going to lunch. They spent approximately 30 to 45 minutes in Dr. Davis' office and then drove to a nearby country club for a two-hour lunch. The State points out that Dr. Davis acknowledged he could not speak in an official capacity or about formal business during the lunch and also claims Dr. Davis testified that his visit with appellant was about Dr. Davis' agenda, not appellant's. Upon his return, appellant sent a letter to Dr. Davis thanking him for inviting him to his son's graduation, for lunch at the country club, and for visits in areas of "mutual interest." Appellant concluded the letter by saying, "Thanks again for including me

in an experience that both Paul and I will cherish for a lifetime."

After some media interest in appellant's trip to LSU, which questioned the propriety of the use of the Texas A & M aircraft, appellant wrote a memo to Dr. Mobley where, according to the State, appellant made the exaggerated claim that he met with Dr. Davis in his office for an hour and a half. Appellant also stressed the trip was important because, "I was a speaker at commencement." The State urges, quite reasonably, that appellant's continued insistence that he was a commencement speaker undermined his credibility in the eyes of the jury, particularly after the jury viewed the videotape of the graduation.

Dr. Mobley testified that Texas A & M officials and employees are allowed to use the plane for official business, but not for personal business. Further, Dr. Mobley stated that university aircraft are not to be used for the purpose of seeing state official's children graduate and testified he would not use a Texas A & M aircraft to see his own children graduate. According to Dr. Mobley, state officials have an obligation to be efficient in the use of state resources. The regulations imposed by the Texas A & M Board of Regents on the use of aircraft specified that: "University owned aircraft are available for use of officials and employees traveling on university agency or system business. Such aircraft, however, should be used only when absolutely necessary."

Under the heading "Restrictions on the use of Aircraft," the Texas A & M policy also provides that appropriated funds may not be extended for the lease or operation of aircraft unless used only for transportation, the purpose of which is official State business. The policy goes on to say that monies appropriated by the Appropriations Act may not be expended for official travel expenses, except for official business as approved by the Board of Regents. Further, there must be a business reason for the presence of passengers. The State

provided evidence that the $1,435 cost for the trip to Baton Rouge was paid with state funds.

On the issue of exploring the possibility of Texas A & M joining the Southeast Conference, the State offered testimony that the Southeast Conference had already extended an invitation to Texas A & M to join. John David Crow, Texas A & M's Athletic Director, testified he was surprised to learn that in the spring of 1993 that appellant already had the votes on the Board of Regents to join the Southeast Conference. Before traveling to LSU, Dr. Mobley told appellant that Dr. Davis would be lobbying for Texas A & M to join the Southeast Conference, but Crow testified he already had several meetings with LSU's Athletic Director to discuss this possibility.

The State claims it was not the business of Texas A & M's Board of Regents to become involved in discussions of this type with presidents of other schools, but was, rather, the regular course of business for school presidents to conduct NCAA matters. The State also claims it is the job of presidents and athletic departments to gather this type of information and provide it to the Board of Regents and that appellant, a Regent, breached the proper chain of command by speaking to a president of another school. In other words, the State claims appellant's discussions with Dr. Davis should have occurred between Dr. Mobley and Dr. Davis.

The State further disputes appellant's claim that he needed to gather financial information in person. John David Crow testified he already had the financial information and could obtain updates with a phone call to an acquaintance who was an administrator with the Southeast Conference. On cross-examination, appellant admitted he could have asked for LSU's financial information over the telephone. R.C. Slocum, Texas A & M's football coach, also testified he could have gotten the financial information on the Southeast

Conference through a phone call. As such, the State contends the jury was free to reject appellant's claim that gathering financial information was one of the purposes behind the trip.

The State also disputes appellant's contention that it was important to have a face-to-face meeting with Dr. Davis. Appellant sought no other face-to-face meetings with any of the other presidents of the nine schools that made up the Southeast Conference, nor did he meet with any presidents or chancellors of the Big 8 Conference. Indeed, Texas A & M ended up joining the Big 8 Conference and appellant never met with any of its chancellors or presidents. On appeal, the State asserts the jury had the opportunity to review the evidence and its verdict simply cannot be found to be irrational.

## III.

### Analysis of the Issues

#### A. Sufficiency of the Evidence

■ In his first and fourth points of error, appellant contends the evidence was legally insufficient to support his conviction for misuse of government property under section 39.02, "as properly construed." Section 39.02 provides:

a. A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly:

\* \* \*

2. Misuses government property, services, personnel, or any other thing of value belonging to the government that has come into the public servant's custody or

possession by virtue of the public servant's office or employment.

TEX. PEN.CODE ANN. § 39.02(a)(2) (Vernon 1994).

■ According to appellant, there are only two correct constructions of section 39.02(a)(2) that could arguably support his conviction, but neither of those theories is supported by the evidence offered at trial. Appellant claims that to establish a violation of section 39.02(a)(2) the State must prove beyond a reasonable doubt that: (1) his trip to LSU involved absolutely no official state business; or (2) he used state property, a Texas A & M aircraft, for both personal and official business purposes and incurred additional costs because of the personal portion of the trip. We agree.[2]

The indictment provides that appellant on or about August 4, 1993:

[d]id then and there intentionally and knowingly, with the intent to obtain a benefit, to-wit: the value of an airplane flight for he and his wife from Houston, Texas to Baton Rouge, Louisiana, and from Baton Rouge, Louisiana to Houston, Texas, misapply a Texas A & M University System's aircraft which was a thing of value belonging to the government that came into his custody and possession by virtue of his office as a Regent of the Texas A & M University System, and the said Ross Margraves, Jr. was then and there a public servant in that he was a Regent of the Texas A & M University System, and the value of the use of the Texas A & M University System aircraft was $750 and more, but less than twenty thousand dollars. . . .

Based on the presentation of the State's case during the trial and the prosecutor's

---

**2.** As part of his first point of error, appellant contends the trial court erred in refusing to quash his indictment, as well as overruling his motion for instructed verdict and motion for new trial. The purpose of a motion to quash an indictment is to object to the form or validity of an indictment. *See* TEX.CODE CRIM. PROC. ANN. arts. 27.08, 27.09 (Vernon

1989). A motion to quash an indictment is not the proper vehicle to contest evidentiary issues. *See St. Jules v. State*, 438 S.W.2d 568, 569 (Tex.Crim.App.1969). Accordingly, the trial court did not err in denying appellant's motion to quash the indictment for legal sufficiency.

arguments in the record and on appeal, the State contends that a conviction is authorized under section 39.02(a)(2) under one or more of the following theories:

1. If a defendant initially intends to benefit personally from the use of state property, he or she misuses state property.
2. If a defendant uses state property in any dual purpose manner, i.e., one of personal benefit and official benefit, he or she misused the state property.
3. If a defendant uses state property in an unreasonable or unnecessary manner that exceeds the costs of other alternatives, he or she misused state property.

Appellant correctly notes there was evidence presented to the jury that appellant conducted official state business while visiting with Dr. Davis on August 4, 1993, in Baton Rouge. On this basis, appellant contends the State failed to prove the trip involved no official state business at all. We find the evidence to be legally insufficient to uphold a conviction under section 39.02 for a "mixed use" of state property under the facts of this case. It is our opinion that, under a proper construction of section 39.02, the mixed use of state property does not violate the statute as a matter of law.[3]

Under appellant's first proposed construction of section 39.02, he claims the testimony was unanimous in establishing that his visit to Baton Rouge to investigate the Southeast Conference and Texas A &

M's possible involvement in that Conference was important official state business that potentially involved huge monetary considerations in the future. Appellant claims further the State cannot second-guess the group charged with the broad discretion and responsibility for oversight of Texas A & M. *See* TEX. EDUC.CODE ANN. § 95.21 (Vernon 1991). Appellant, therefore, contends the State failed to prove a violation of section 39.02(a)(2) beyond a reasonable doubt, because it did not establish that appellant conducted absolutely no official business.

Under appellant's second proposed construction of section 39.02, he contends the State must show he used the Texas A & M aircraft for both personal and official state business and, in the process, incurred additional costs by also conducting personal use of state property. Appellant argues, and the court agrees, that the ultimate question in this matter is: What constitutes "misuse" of government property when the use in question indisputably has both a personal and official state purpose?

Neither appellant nor the State have cited us to any Texas decisions involving such a mixed use scenario. Despite requests for additional briefing, neither party provided the court with any case law from this jurisdiction or from any other state involving the prosecution of a state official for the "misuse" of state property when the use of that property resulted in both an official and personal benefit nor could this court locate such a case.[4]

---

3. In support of this argument, appellant refers us to Texas Ethics Opinion No. 164 (1993) ("An individual State employee who is using State resources to search for a new job in a way that had been expressly authorized by the agency's board, would not, as an individual, be misapplying State property"). In light of our disposition of this appeal, we express no opinion on whether Ethics Opinions should be construed as providing a defense under section 39.02 or whether such Opinions can be used as substantive law concerning the proper construction of a penal statute.

4. The State cites us to *People v. Harby*, 51 Cal.App.2d 759, 125 P.2d 874 (1942). There a city councilman was removed from office for misappropriation of a city automobile, which he drove from Los Angeles to Great Falls, Montana with a side trip to the Grand Canyon. Two months after his return, he claimed the purpose of his trip was to view parking systems, particularly the one in Great Falls. There was no evidence in that case, however, that Harold Harby conducted any other city business while on his vacation. As detailed above, there is overwhelming evidence of official business conducted in this

Appellant contends the only misuse the State can establish in such a mixed use scenario is if the personal portion of the trip resulted in additional costs to the state. Here, there was no evidence offered and none exists, according to appellant, that meeting with his son for ten minutes after graduation resulted in an increased cost to the state. In closing arguments, the State requested the jury to look to the "primary purpose" of appellant's trip.

Under the State's first theory, criminal liability is imposed based on the original motivating intent for the use of the airplane. Appellant counters that the statute penalizes only the actual misuse of state property, not the intended misuse of state property. *See* TEX. PEN.CODE ANN. § 39.02(a)(2) (Vernon 1994). Therefore, appellant asserts that all circumstances at the time of the use must be considered when determining whether the use is appropriate and whether criminal liability can be imposed. In support of this, appellant argues that mixed use of state aircraft was officially sanctioned by the Texas Ethics Commission, the State Aircraft Pooling Board, and the management of Texas A & M as of August 1993. Accordingly, appellant claims that even if his sole intent when scheduling the aircraft in March or April 1993 was for personal benefit, that intent cannot control the ultimate determination of criminal culpability because the evidence established the trip ultimately involved official state business purposes.

The State's second theory requires criminal liability to be imposed for any mixed use of state property, one involving both personal and official business. Appellant contends this construction is equally flawed. We agree that this construction could well lead to prosecutorial abuse. As we noted earlier, neither party has cited us any case where a state official has been prosecuted for utilizing state property in a manner that benefitted both the state and the individual. We find the lack of precedent supports the proposition that a state official cannot be *prosecuted* for such a mixed use. The dilemma is where to draw the line on the relative percentages of personal and official business and neither party has suggested a viable formula.[5] Nor does the statute suggest a solution. We feel this is a question best addressed by the legislature and, thus, decline to assign an arbitrary level of permissible state business that can be conducted in such a "mixed use" scenario.

Finally, the State's third possible theory for criminal culpability arose during closing argument. There, the State asserted that state property can be misused, even in furtherance of official state business, if the use is unreasonable or unnecessary in that the costs exceeded other alternatives. As evidence of this, appellant cites to the following argument by the prosecutor:

> The crux of this case, the key to this case, the backbone of this case, is that we can spend funds if it's necessary, if it's reasonable and if it clearly involves State business.
>
> We can't spend funds if it clearly involves state business, but it's not reasonable. . . .

The State simply argues the jury had the opportunity to listen to appellant's evidence and they were entitled to reject it. In short, the State claims the first point of error should be overruled because the jury

---

case. We do not view *Harby* as a true "mixed use" scenario.

**5.** Appellant again refers us to another Texas Ethics Commission opinion that purportedly authorizes the personal use of state property. *See* Texas Ethics Opinion No. 164 (1993) ("An individual State employee who is using State resources to search for a new job in a way that had been expressly authorized by the agency's board, would not, as an individual, be misapplying State property"). Appellant argues further that the decision as to the appropriate use of State property is a question that first must be resolved by the applicable state agency. *See, e.g.,* Texas Ethics Opinion No. 147 (1993) and Texas Ethics Opinion No. 260 (1995).

acted appropriately when they found there was sufficient evidence proving beyond a reasonable doubt that appellant misused a Texas A & M aircraft and simply rejected his contention that the trip was for official state business. We disagree.

The standard for review applicable to a motion for instructed verdict and a motion for new trial is the same standard in reviewing legal sufficiency of the evidence. *See Roper v. State,* 917 S.W.2d 128, 130 (Tex.App.—Fort Worth 1996, pet. ref'd); *see also Griffin v. State,* 936 S.W.2d 353, 356 (Tex.App.—Houston [14th Dist.] 1996, no pet.). We must consider all the evidence in the record in the light most favorable to the jury's verdict and decide whether any rational jury could have found from that evidence whether a defendant committed each element of the crime. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the offense. *See Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997).

■ Under the hypothetically correct jury charge for the misapplication of state property under section 39.02(a)(2), we hold that a public official cannot be prosecuted for a "mixed use" of state property where the evidence conclusively establishes that the use of the state property benefits both the individual and the state. We stress that this holding is strictly limited to the facts of this case where appellant provided overwhelming evidence of official business conducted on his trip to Baton Rouge. It is our opinion that the State failed to prove that appellant "misused" the Texas A & M aircraft. Instead, the State merely established that there were alternative means to secure the information related to the Southwest Conference while he was at LSU. The statute, however, does not criminalize the inefficient use of state property. Nor, in our opinion does section 39.02(a)(2) criminalize the use of state property in contravention of the Appropriations Act.

*See* 71st Leg.,R.S., ch. 1263, 1989 Tex. Gen. Laws 5093, *et seq.*

By this opinion, we are not suggesting that a state official is at liberty to freely use state property in a mixed use manner without repercussions. Rather, we merely hold that the mixed use in this case is not a *criminal* violation as section 39.02(a)(2) is currently written. We note that section 95.21 of the Education Code gives the Texas A & M Board of Regents oversight of Texas A & M. *See* TEX. EDUC CODE ANN. § 95.21 (Vernon 1991). Texas A & M, just as other state agencies, is entitled to oversee the appropriate use of its property and reimburse its officials or request reimbursement from its officials in cases where the agency finds that the mixed use of state property was not authorized under the Appropriations Act or internal guidelines and regulations. We sustain appellant's first point of error in part.

In his fourth point of error, appellant argues the evidence was insufficient to support the indictment, the charge and the verdict, and requests we reverse the conviction and render a judgment of acquittal. Appellant contends the evidence was insufficient in four areas: (a) no evidence of intent; (b) no evidence of intent to obtain a benefit; (c) no evidence of intentional or knowing misuse of government property; and (d) no evidence of misuse of state aircraft or state funds. Based on our holding above, that a state official can not be prosecuted for the "mixed use" of state property under section 39.02(a)(2), we also sustain appellant's fourth point of error.

**B. The Constitutionality of Section 39.02**

■ In his second point of error, appellant contends that section 39.02 is unconstitutionally vague and violates the Fifth and Fourteenth Amendments to the United States Constitution and article 1, section 19 of the Texas Constitution. Unlike an overbreadth claim, a vagueness challenge is applicable to all criminal laws, not merely those that regulate speech.

*See Bynum v. State,* 767 S.W.2d 769, 773 (Tex.Crim.App.1989). All criminal laws must give fair notice to the populace as to what activity is made criminal so that individuals have fair warning of what is forbidden. *See id.* This entails a two-step inquiry. First, we must determine whether appellant, as an ordinary person, received sufficient information from the statute to understand exactly what conduct is prohibited so that he could act in a lawful manner. *See State v. Fry,* 867 S.W.2d 398, 401 (Tex.App.—Houston [14th Dist.] 1993, no pet.). A statute need not be mathematically precise; it only must give fair warning, in light of common understanding and practices. *See id.* Second, we must determine whether section 39.02(a)(2) provides sufficient notice of the prohibited conduct to law enforcement personnel, so that appellant is not arbitrarily or discriminatorily prosecuted by the State or convicted by the jury. *See id.* If either of these inquiries is not met, a statute can be found unconstitutionally vague. *See id.* (citing *Adley v. State,* 718 S.W.2d 682, 685 (Tex. Crim.App.1985)).

■ When analyzing a statute for vagueness, hypothetical situations are not utilized; instead we must examine the statute to determine whether it is impermissibly vague as applied to the challenging parties' specific conduct. *See Bynum,* 767 S.W.2d at 774. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. *See id.* (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1981)).

Here, appellant was indicted under section 39.02(a)(2), which provides that a public servant commits an offense if, with the intent to obtain a benefit, he intentionally or knowingly misapplies anything of value belonging to the government that has come into his custody or possession by virtue of his office. *See* TEX. PEN.CODE ANN. § 39.02(a)(2) (Vernon 1994). The in-

dictment specified that the thing of value belonging to the government was an aircraft owned by Texas A & M University System. The charge defined the term misapply as "to apply wrongly or to misuse or spend without proper authority." The statute clearly provides for criminal liability for the intent to use state property for personal benefit, but does not purport to criminalize the "mixed use" of state property in a manner that realizes both an official and personal benefit. The State disagrees and contends that the statute passes constitutional muster because a reasonable person would know that section 39.02(a)(2) prohibits the use of state aircraft to travel to a relative's college graduation. We would agree with the State, had appellant *only* attended his son's graduation while in Baton Rouge. The record reflects, however, that appellant also conducted state business while he was there. We echo the concerns of Amici Curiae that the State's construction of section 39.02(a)(2) allows prosecutors to "second guess" public officials who may, quite innocently, mix business and personal matters while conducting state business.

While cognizant of the rule of construction that hypothetical situations should not be addressed in ruling on a vagueness challenge, *see Bynum,* 767 S.W.2d at 774, we nevertheless offer some examples to illustrate the fallacy in the State's position on this point. Applying the State's analysis, criminal liability would attach if a judge goes to the theater or plays a round of golf while attending a judicial conference, a district attorney can be prosecuted for lunching with a relative while out of town on official business, and the governor could be indicted if he visits his relatives on personal matters while he is in Florida on state business. Deciding what conduct is criminal becomes even more difficult when the State, as it did here, mixed Texas A & M's internal regulations with the official misconduct statute. While conceding that State university officials can certainly violate section 39.02, we note that

section 39.02 does not require that state business be conducted in the most economical manner. The State's contention that an official act must be performed in the most "reasonable" manner is, likewise, not apparent from the face of the statute or even, as far as we can see, from reading between the lines. Specifically, the statute does not attempt to criminalize the act of flying to Louisiana to conduct business that could have been done by a telephone call. Finally, the statute does not provide that state property should be "used only when absolutely necessary," as does Texas A & M's travel policy.

It is our opinion that nothing in section 39.02 incorporates, by reference or by implication, Texas A & M's internal regulations. While those regulations are sufficiently clear to put appellant, or any other university official, on notice of what is expected of them in their respective positions, section 39.02(a)(2) is not. The statute provides no notice that it also encompasses alleged violations of Texas A & M's internal regulations. Accordingly, we hold that section 39.02(a)(2) is unconstitutionally vague as applied to the . facts of this case. The jury charge composed of Texas A & M's travel regulations illustrates this point. The charge instructed the jury to convict unless it found that "the purposes of the travel *clearly* involved official state business" and further instructed the jury that the transportation *must* meet eight additional criteria.[6] Texas A & M's regulations obviously impose stricter control on

the use of Texas A & M property, such as the airplane in this case, than does section 39.02(a)(2), which only generally criminalizes the misapplication of state property. We question whether the legislature intended the use of section 39.02(a)(2) as a mechanism for prosecutors to police the actions of officials such as a Board Regent when he or she uses state property in a manner that benefits both the State and the public servant. It is our opinion that the Boards of Regents at each State university are amply capable of policing such matters.

In any event, the statute provides no fair warning and insufficient information of whether criminal liability attaches to instances where a state official engages in "mixed use" of state property. In our opinion, appellant undeniably conducted state business while in Baton Rouge on what was, admittedly, a dual purpose trip. We hold that section 39.02(a)(2) provided insufficient notice to appellant and to law enforcement personnel as to whether an obvious "mixed use" of state property can be considered to be criminal. We reiterate again that this holding is strictly limited to the facts of this case. We also sustain appellant's second point of error.

## C. *A Fatal Variance Between the Indictment and the Charge?*

▬▬▬ In his third point of error, appellant contends a fatal variance existed between the indictment and the charge which now requires reversal. The indict-

---

**6.** The court charged the jury that transportation must meet the following criteria: (1) the purpose of the trip is official business; (2) all passengers are state officers or employees, or are persons in the care or custody of state officers or employees, or are persons whose transportation furthers the official state business purpose of that flight; (3) the destination is not served by commercial carriers, or the time required to use such a carrier interferes with other obligations, or the number of state officers and employees traveling makes the use of state aircraft cost effective; (4) any speeches to be given by passengers are related to official state business; (5) events attended by passengers are not sponsored by a political

party or for its promotion; (6) no fees or honorariums are received by passengers, unless travel costs are reimbursed to the State; (7) no money is raised for private or political purposes; and (8) audiences are not charged to see or hear any of the passengers. Although we do not need to reach appellant's fifth point of error complaining of the special instructions included in the charge, we nevertheless are compelled to express our disapproval with the charge that, in our opinion, rewrote the statute by incorporating Texas A & M's internal regulations. Under the charge in this case, the jury had no choice but to convict.

ment alleged misuse of the state aircraft. According to appellant, the special instructions in the charge focused on state funds, which permitted a conviction for an offense (misuse of state funds) other than that for which he was indicted (misuse of a state aircraft). Appellant contends the charge should have been limited to the allegations in the indictment and that it clearly violated state law. *See, e.g., Hobbs v. State,* 548 S.W.2d 884, 887–88 (Tex.Crim.App.1977). Because the indictment alleged a misuse of state funds, appellant contends the State was required to prove a different set of elements than a misuse of state aircraft. Under an indictment for misuse of state funds, the State is required to prove appellant's actual possession of state funds. *See, e.g., Reynolds v. State,* 130 Tex.Crim. 78, 92 S.W.2d 458, 459 (1936) (for officer to be guilty of misapplying public funds, officer must have had actual possession of funds at the time of misapplication).

Here, appellant argues there was no evidence he actually possessed state funds. Appellant concedes he did come into actual possession of a state aircraft by virtue of his position as a Regent of Texas A & M, but asserts he never actually possessed any state funds. He points out that the evidence conclusively established he was not involved in the voucher process that caused state funds to be transferred from Austin to the Texas A & M Aircraft Operation in College Station. The record reveals that other people processed the voucher request, forwarded the documents to Austin, and caused the Texas Comptroller's office to reimburse Texas A & M for the cost of the trip. Because no evidence was presented demonstrating that appellant actually possessed these funds, he contends reversal is required.

At the charge conference, appellant did not object to the inclusion in the charge on the basis that it allowed the jury to convict if they believed he misused the funds. Because appellant did not argue this point at trial, the trial court was not given the opportunity to address this complaint. His failure to object to the charge, waives all but egregious harm. *See Williams v. State,* 851 S.W.2d 282, 287 (Tex.Crim.App.1993), *o'ruled on other grounds, Posey v. State,* 966 S.W.2d 57, 62–63 (Tex.Crim.App.1998). On the question of harm, when the court's charge taken as a whole, sufficiently presents the applicable law and protects the defendant's rights, the judgment will be affirmed. *See Coleman v. State,* 881 S.W.2d 344, 356 (Tex.Crim.App.1994). Here, the application paragraph in the court's charge limited the property in question to "Texas A & M University System's aircraft." *See Grudzien v. State,* 493 S.W.2d 827, 828 (Tex.Crim.App.1973). We overrule appellant's third point of error.

## IV.

### *Conclusion*

In light of our disposition of points of error one through four, we need not reach appellant's, fifth, sixth, seventh, and eighth points of error. We reverse this matter and render a judgment of acquittal.